**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JOYCE L. CHETOKA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 13-941 |
| | ) | Judge Nora Barry Fischer |
| CAROLYN W. COLVIN, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION</u>

### I.  INTRODUCTION

Joyce L. Chetoka, ("Plaintiff"), brings this action pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3), seeking review of the final determination of the Commissioner of Social Security ("Defendant" or "Commissioner") denying her application for supplemental security income ("SSI") under Title XVI of the Social Security Act ("Act") [42 U.S.C. §§ 1381–1383f]. This matter comes before the Court on cross motions for summary judgment. (Docket Nos. 9, 13). For the following reasons, Plaintiff's Motion for Summary Judgment [9] is denied and Defendant's Motion for Summary Judgment [13] is granted.

### II.  PROCEDURAL HISTORY

Plaintiff filed protectively for SSI on March 9, 2010, alleging a disability onset date of November 1, 2009. (R. at 146, 150).[1] Her alleged disabling impairments were depression, neuropathy, hypertension, anxiety, and a back injury. (R. at 155, 179, 247). The Social Security Administration ("SSA") informed Plaintiff in a letter dated June 11, 2010 that she did not qualify for SSI. (R. at 55–58). Plaintiff retained legal counsel, Domenic Bellisario, Esq., and requested a

---

[1] Citations to Docket Nos. 7-1 through 7-13, the Record, *hereinafter*, "R. at _."

hearing before an Administrative Law Judge ("ALJ"). (R. at 60, 109). A hearing was held before ALJ Michael F. Colligan on January 25, 2012. (R. at 26–52). Plaintiff's counsel was present and a neutral vocational expert, Samuel E. Edelmann, M.Ed.,[2] offered testimony. (*Id.*).

The ALJ denied Plaintiff's claim for SSI in a decision dated March 7, 2012. (R. at 11–20). On March 19, 2012, Plaintiff requested review of the ALJ's decision by the Appeals Council but was denied on June 20, 2013, at which time the ALJ's decision became the final decision of the Commissioner. (R. at 1, 7). Plaintiff filed a Complaint in this Court on June 3, 2013. (Docket No. 3). Defendant filed an Answer on August 30, 2013. (Docket No. 6). On September 27, 2013, Plaintiff filed a Motion for Summary Judgment and a Brief in Support. (Docket Nos. 9, 10). Defendant's Motion for Summary Judgment and Brief in Support were filed on November, 18, 2013. (Docket Nos. 13, 14). This matter has been fully briefed and is ripe for disposition.

## III.    STATEMENT OF FACTS

### A.    General Background

Plaintiff was born on December 6, 1967, and was forty-four years old[3] at the time of the hearing. (R. at 29). Plaintiff was unmarried and living in a duplex home with her twenty-one year old son. (R. at 29–30). She completed a high school education and attended college but did not graduate. (R. at 30). Her previous work experience was as a waitress. (R. at 32). In 1997, her husband passed away, at which time she began to suffer from depression. (R. at 38).

She asserted that her daily activities consisted of watching television, talking on the phone, going to doctor's appointments, cooking, and cleaning. (R. at 165). Plaintiff was not able

---

[2] Mr. Edelman completed his Masters of Education and Rehabilitation Counseling at the University of Pittsburgh in 1973. From 1975 to present, Mr. Edelman has been engaged in the private practice of vocational rehabilitation counseling and consultation. (R. at 133).

[3] The SSA's regulations define "Younger Person" as a person who is less than 50 years of age. 20 C.F.R. §§ 404.1563, 416.963.

to lift anything heavy and tried to avoid walking but was able to shop for groceries once a week for at least one hour. (R. at 168–69, 171). Her social activity consisted of watching television with her boyfriend. (R. at 170). Although she alleged difficulty paying attention, Plaintiff felt that she was "ok" at following directions. (R. at 171).

**B.  Employment History**

In her SSI application, Plaintiff listed her past work as "office assistant" (1996) and "waitress" (1994–2000), but there was some confusion during the hearing regarding the dates of her past employment. (R. at 31–32, 157). Plaintiff's position as a waitress was classified by the vocational expert as light, unskilled work. (R. at 47, 157). The vocational expert did not provide a classification for Plaintiff's past work as an office assistant. (*Id.*). Plaintiff testified that she had not worked since her application date. (R. at 31).

**C.  Mental Treatment History**

Dr. Phillip Mandoly, M.D., provided psychiatric treatment to Plaintiff every three months from March 30, 2010 to December 8, 2011. (R. at 407–37). Observations from Dr. Mandoly's initial psychiatric evaluation on March 30, 2010 were unremarkable. (R. at 421–25). He reported that Plaintiff had previously received psychiatric care at the Stauntin Clinic from 2005 to 2006, and was returning for treatment due to a high level of anxiety, panic feelings, crying spells, decreased energy, and decreased motivation. (R. at 424). Dr. Mandoly checked "No" on the section of the evaluation form labeled "Pain Screen." (R. at 422). Plaintiff was diagnosed with Anxiety Disorder NOS, R/O Depressive Disorder NOS, Hypertension, and Peripheral Neuropathy. (R. at 424). Dr. Mandoly observed that Plaintiff was well-groomed, cooperative, displayed normal speech, her thought organization and control were normal, her memory was intact, she had good insight and judgment, and was of average intelligence. (R. at 423). Plaintiff's mood was sad and anxious. *Id.* Her affective expression was depressed and tearful.

(*Id.*). She denied suicidal thoughts. (*Id.*). Dr. Mandoly prescribed Xanax[4] for Plaintiff's anxiety and Trazadone[5] for her sleep, further noting that Plaintiff may need an antidepressant medication in the future. (*Id.*). These findings are typical of Dr. Mandoly's observations over the course of treatment. (R. at 407–37).

On May 6, 2010 Plaintiff again complained to Dr. Mandoly of depression but reported improvements in her anxiety. (R. at 436). In a treatment report dated August 5, 2010, Dr. Mandoly noted that Plaintiff's mood was depressed and he added a prescription for Prozac.[6] (*Id.*). On October 28, 2010, Dr. Mandoly noted that Plaintiff had not taken Prozac as prescribed. (R. at 435). He further reported that Plaintiff was dealing with a lot of stressors, including that her daughter "has been in trouble with the law." (*Id.*). Her mood was depressed and she was teary, although Dr. Mandoly opined that Plaintiff was not suicidal. (*Id.*). Her condition was unchanged on January 25, 2011, when Plaintiff reported still feeling depressed. (R. at 411). At this appointment, Plaintiff also complained of problems with her boyfriend of four years, in that he was not contributing to the household bills. (*Id.*). Plaintiff said that she was upset that their relationship seemed to be ending, and that she was lonely. (*Id.*). Her mood remained dysthymic[7]

---

[4] Xanax, or Alprazolam, belongs to a class of medications called benzodiazepines, and it used to relieve symptoms of anxiety or panic. MayoClinic.com, Aprazolam, *available at http://www.mayoclinic.org/drugs-supplements/alprazolam-oral-route/description/DRG-20061040* (last visited January 27, 2014).

[5] Trazodone belongs to the group of medicines known as antidepressants or 'mood elevators.' It is used to relieve mental depression, and depression that sometimes occurs with anxiety." Mayoclinic.com, Trazodone, *available at http://www.mayoclinic.com/health/drug-information/DR601375* (last visited December 6, 2013).

[6] Prozac, or fluoxetine, is an antidepressant that belongs to a group of medications known as selective serotonin reuptake inhibitors, and is used to treat depression and panic disorders. Mayoclinic.com, Fluoxetine, *available* at http://www.mayoclinic.org/drugs-supplements/fluoxetine-oral-route/description/DRG-20063952 (last visited January 27, 2014).

[7] "The essential feature of Dysthmic Disorder is a chronically depressed mood that occurs for most of the day more days than not for at least 2 years." American Psychiatric Association, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (DSM-IV-TR) 32–33 (4ᵗʰ ed. 2000).

on April 19, 2011, at which time her dosages of Prozac and Xanax were further increased. (R. at 410). On July 7, 2011, Dr. Mandoly noted that Plaintiff's mood was euthymic[8] and recommended continued adherence to her prescribed medications. (R. at 409). A treatment note from September 13, 2011, indicated that Plaintiff was suffering from depression, although she believed her problems were situational. (R. at 408). Her range of affect was labile[9] and she was "teary eyed." (*Id.*). Notes from December 8, 2011, Plaintiff's final appointment with Dr. Mandoly, list the following findings: appropriate appearance; normal psychomotor activity; normal rate of speech; normal volume of speech; normal range of affect; no suicidal or homicidal impulses; normal impulse control; no delusions; no hallucinations; complete orientation; and good insight. (R. at 407). Plaintiff remained dysthymic and was given a prescription for Seroquel.[10] (*Id.*).

On September 23, 2011, Kristine Watson, whose credentials are unknown,[11] opined that Plaintiff was disabled from work and was a possible candidate for Disability Insurance Benefits ("DIB") and SSI. (R. at 438). The form signed by Ms. Watson states that it would be used by the Department of Public Welfare in determining qualification for general assistance benefits. (*Id.*).

---

[8] "Euthymia" is defined as "[j]oyfullness, mental peace and tranquility [or] [m]oderation of mood, not manic or depressed." STEDMAN'S MEDICAL DICTIONARY 678 (28th ed. 2005).

[9] "[D]enoting free and uncontrolled mood or behavioral expression of the emotions." *Id.* at 1037.

[10] Seroquel (generic name "Quetiapine"), "is used to treat nervous, emotional, and mental conditions (eg, schizophrenia). Mayoclinic.com, Quetiapine, *available at http://www.mayoclinic.org/drugs-supplements/quetiapine-oral-route/description/DRG-20066912* (last visited January 16, 2014).

[11] The Plaintiff bears the burden to establish disability. *Terwilliger v. Comm'r of Soc. Sec.*, Civ.A. 13-924, 2014 WL 222007, at *12 (W.D. Pa. Jan. 21, 2014) (Fischer, J) (citing *Brewster v. Heckler*, 786 F.2d 581, 583 (3d Cir. 1986)). To the extent that Plaintiff wishes to rely on Ms. Watson's opinion, Plaintiff bore the burden to put on evidence establishing her credentials. For further discussion of this issue, see *infra* Section V.B.

Ms. Watson provided no objective findings to support her conclusion of disability. (R. at 17, 438.)

Plaintiff was treated by Tim Gilfont, LSW, at the Staunton Clinic from February 17, 2010 to December 12, 2010. (R. at 412–20, 426–34). Findings from these visits were generally unremarkable. (*Id.*). Plaintiff consistently complained of social and domestic stressors during these sessions and often exhibited anxiety and a teary affect. (*Id.*). A note from Plaintiff's last visit, dated December 29, 2010, indicates that Plaintiff's anxiety had "leveled off." (R. at 412). On January 30, 2012, Mr. Gilfont, completed a form consisting of a series of check marks entitled "Medical Source Statement About What the Claimant Can Still Do Despite Mental Impairment(s)," ("the disability opinion"). (R. at 439–43). Mr. Gilfront assessed Plaintiff with marked or extreme limitations in twenty-eight work-related activities. (*Id.*). Spaces designated for "clinical findings" and "other symptoms and remarks" were left blank. (R. at 440). Dr. Mandoly signed the disability opinion. (R. at 443).

While receiving treatment at the Staunton Clinic, Plaintiff was assessed with Global Assessment of Functioning[12] ("GAF") scores between 64 and 52. (R. at 18, 412–39). Twelve of Plaintiff's fifteen GAF scores were 55 and above, and with the exception of a score of 50 that was assessed in the disability opinion, an upward trend in scores is evident. (R. at 18, 439). On December 29, 2010, Plaintiff's GAF score was 63. (R. at 18, 412).

Dr. Edward Zuckerman, Ph.D., completed a mental residual functional capacity assessment of Plaintiff on June 1, 2010 following a review of the medical record. (R. at 225–27).

---

[12] Global Assessment of Functioning is a numeric score ranging from 0 to 100 reported on Axis V of the Multiaxial Assessment. American Psychiatric Association, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (DSM-IV-TR) 32–33 (4th ed. 2000). The "Axis V is for reporting the clinician's judgment of the individual's overall level of functioning. This information is useful in planning treatment and measuring its impact, and in predicting outcome." *Id.*

Dr. Zuckerman found that Plaintiff had moderate limitations in the following categories: the ability to maintain attention and concentration for extended periods; the ability to complete a normal workday/workweek without interruptions from psychological symptoms and perform at a consistent pace without an unreasonable amount of rest; the ability to interact appropriately with the general public; the ability to accept instructions and respond appropriately to criticism from supervisors; the ability to respond appropriately to changes in work settings; and the ability to set realistic goals or make plans independently of others. (*Id.*). Plaintiff was diagnosed with Anxiety Disorder NOS, Panic Disorder, Major Depressive Disorder, and Alcohol Dependence in Recent Full Remission[13]. (R. at 227). Plaintiff's statements were found to be partially credible based upon the evidence in the record. (*Id.*). Dr. Zuckerman concluded that despite her moderate limitations, Plaintiff was able to meet the basic mental demands of competitive work. (*Id.*).

### D.    Physical Treatment History

Plaintiff received physical therapy at Keystone Rehabilitation from June 6, 2005 to June 4, 2006. (R. at 304–401). During her initial evaluation, she reported pain stemming from a car accident in her back and neck, which she rated between 9/10 and 10/10. (R. at 313). In a progress note dated November 10, 2005, Plaintiff's physical therapist indicated that Plaintiff had reported at least a fifty percent subjective improvement in her condition after therapy. (R. at 339). She continued to have some pain in her middle thoracic area, but had resumed household chores and was no longer complaining of low back pain. (*Id.*).

In August 2009, Plaintiff underwent an EMG conduction study. (R. at 194–95). Dr. Shannon L. McFeaters, M.D., observed that the results were normal, with no electro diagnostic

---

[13] Under the Act, "[a]n individual shall not be considered to be disabled … if alcoholism or drug addiction would … be a contributing factor material to the [ALJ]'s determination that the individual is disabled." 42 U.S.C. § 423(d)(2)(C).  Before the effect of alcoholism may be considered, the ALJ must have found the claimant to be disabled. *Parks v. Commissioner of Soc. Sec.*, 401 F. App'x. 651, 656 (3d Cir. 2010).

evidence of peripheral neuropathic[14] or myopathic[15] process. (R. at 193–94). Plaintiff requested a refill of her pain medication but Dr. McFeaters refused to write a prescription until Plaintiff had completed blood tests. (R. at 193). Plaintiff did not show up for her next scheduled appointment with Dr. McFeaters. (*Id.*).

Dr. Manasi Gahlot, M.D., examined Plaintiff at Allegheny Neurological Associates ("Allegheny Neurological") on November 19, 2009. (R. at 271). Notes from that physical examination provide that Plaintiff had grossly normal cranial nerves. (*Id.*). She exhibited 5/5 power throughout, but complained of pain in her lower extremities. (*Id.*). Her sensations were intact and there was no ataxia[16] on finger-to-nose and heel-to shin. (*Id.*). Plaintiff's gait appeared incompatible with a gait problem syndrome and there was no pain within the entire range of motion of joints in her lower extremity. (*Id.*). Finally, there was no back pain or tenderness. (*Id.*). Dr. Gahlot opined that Plaintiff could have peripheral neuropathy, likely caused by alcoholism, even though her tests had been negative. (R. at 272). He observed that Plaintiff was very emotional and cried during physical examination, which she said was a result of pain. (*Id.*). Plaintiff asked Dr. Gahlot for a Vicodin prescription, but he explained that it would not relieve the type of pain she was experiencing. (*Id.*). Instead, Dr. Gahlot prescribed an increased dosage of Neurontin.[17] (*Id.*).

---

[14] "Neuropathy" is a "classic term for any disorder affecting any segment of the nervous system." STEDMAN'S MEDICAL DICTIONARY 1037 (28th ed. 2005).

[15] "Denoting a disorder involving muscular tissue." *Id.* at 1274.

[16] "An inability to coordinate muscle activity during voluntary movement." *Id.* at 172.

[17] Neurontin (generic name "gabapentin"), "is used to help control partial seizures (convulsions) in the treatment of epilepsy…Although this use is not included in the product labeling, gabapentin is used in certain patients with the following medical condition." Mayoclinic.com, Gabapentin, *available at http://www.mayoclinic.org/drugs-supplements/gabapentin-oral-route/description/DRG-20064011* (last visited January 16, 2014).

She was next treated at Allegheny Neurological on March 25, 2010, at which time she remained tearful and complained of pain in her legs. In a treatment note dated July 15, 2010, she complained of pain in her feet, knees, ankles, and hip. (R. at 270). At her last appointment at Allegheny Neurological on November 11, 2010, Plaintiff reported that her symptoms were unchanged and Dr. Gahlot suggested an arthritis evaluation. (R. at 269).

Plaintiff was first examined by Dr. Yaaqov M. Abrams, M.D., on December 3, 2009. (R. at 265). She denied depression, anxiety, mood swings, stress, memory problems, or substance abuse. (*Id.*). Further, Dr. Abrams noted no muscle, joint, or lower back pain. (*Id.*). Dr. Abrams diagnosed Plaintiff with Back Disorder NOS, Anxiety State NOS, and Benign Hypertension.[18] (R. at 266). He provided a one week supply of narcotic pain medication but cautioned Plaintiff that she would have to produce outside records which substantiated her claims before he would prescribe a refill. (*Id.*). On January 4, 2010, Plaintiff told Dr. Abrams that she was unemployed due to chronic pain. (R. at 264). Plaintiff sought a refill of her pain medication on March 1, 2010. (R. at 263). Dr. Adams cautioned that he would not refill her prescription again if she did not attend pain and neurological clinics. (*Id.*).

On June 8, 2010, Plaintiff told Dr. Abrams that she had developed a rash from poison ivy while standing up to work in her neighbor's garden. (R. at 261). Dr. Abrams diagnosed Plaintiff with Alcohol Abuse- Continuous, per patient in remission. (R. at 261–62). Her diagnosis of Hypertension remained benign, but Dr. Abrams opined that her blood pressure may have been elevated by anxiety. (R. at 261). On June 21, 2010, Plaintiff complained of rashes on her arms and abdomen. (R. at 260). Dr. Abrams opined that Plaintiff's hypertension had improved and

---

[18] A high blood pressure disorder "that runs a relatively long and symptomless course." STEDMAN'S MEDICAL DICTIONARY 927 (28th ed. 2005).

remained asymptomatic. (*Id.*). She appeared healthy, alert, and cooperative. (*Id.*). On August 18, 2010, Plaintiff had not taken her medication for hypertension and her blood pressure was moderately elevated. (R. at 257). She denied taking extra pain relievers and was warned by Dr. Abrams that failing her drug screening would result in a discontinuance of her narcotic prescriptions. (*Id.*). On November 4, 2010, Plaintiff's blood pressure was described as "well controlled" by her medication. (R. at 255).

Dr. Paul Fox, M.D., completed a physical residual capacity assessment of Plaintiff on June 8, 2010 following a review of the medical record. (R. at 242–48). Plaintiff's statements were found to be partially credible based upon this review. (R. at 248). Dr. Fox assessed Plaintiff with the following functional limitations: occasionally lifting/carrying twenty pounds, frequently lifting no more than ten pounds, standing and walking for no more than four hours, sitting for a total of six hours in an eight hour work day. (R. at 243–45). He also noted the likelihood of some environmental limitations. (*Id.*). Plaintiff was diagnosed with alcoholic neuropathy. (R. at 247).

### E.      Administrative Hearing

A hearing was held before the ALJ, Michael F. Colligan, on January 25, 2012 in Pittsburgh, Pennsylvania. (R. at 26). Plaintiff was present and represented by attorney Dominic Bellasario, Esq. (*Id.*). A vocational expert, Samuel E. Edelmann, M.Ed., also offered testimony. (R. at 133). At the start of the hearing, Plaintiff's counsel offered into evidence the disability opinion signed by Dr. Mandoly as well as the form signed by Ms. Watson. (R. at 27). Counsel informed the ALJ that Plaintiff was recently prescribed Seroquel to treat bipolar disorder. (*Id.*).

The ALJ then agreed to keep the record open for thirty days for the receipt of additional medical evidence. (*Id.*).[19]

Plaintiff was born on December 6, 1967 and was forty-four years old at the time of the hearing. (R. at 29). She was not married and lived in a duplex home with her son who was twenty-one years old. (R. at 29–30). Although Plaintiff attended college, she did not attain a degree. (R. at 30). She had not worked since the filing of her application in 2010. (R. at 31). There was some confusion during the hearing regarding her past work experience. (R. at 32). The ALJ observed that Plaintiff had worked as a waitress from 1994 to 2000 and as an office assistant in a hospital. (*Id.*). Specifically, the time periods during which Plaintiff held these positions were uncertain. (*Id.*).

Plaintiff stated that she suffered from pain in her legs which disabled her from work. (*Id.*). She described this pain as throbbing and shaking, making it difficult for her to walk or sit, and said she was being treated by Doctors Watson and Gahlot. (R. at 33).[20]

In addition to treatment for her leg pain, Plaintiff was receiving mental health treatment. (R. at 35). She testified that she was a patient at the Staunton Clinic and was taking her medications as prescribed without any complications. (R. at 35–36). Plaintiff was also scheduled to see a therapist and testified that she believed she had kept all of her treatment appointments. (R. at 36–37).

Plaintiff's counsel proceeded with direct examination of Plaintiff. (R. at 37). She testified that her husband passed away in 1997. (R. at 38). Although she recalled being hospitalized for

---

[19] On February 6, 2012, Plaintiff's attorney Domenic Bellisario submitted a letter to the ALJ, wherein Mr. Bellisario argues that the medical source statement of Dr. Mandoly should be given greater weight. (R. at 185–86).

[20] The Court notes that Plaintiff appears to have been referring to Kristine Watson, whose professional credentials, as noted, are unclear from the record.

mental illness, Plaintiff could not remember what hospital she was in or for how long. (*Id.*). Plaintiff testified to being prescribed the following medications: Seroquel, Trazodone, Klonopin,[21] Prozac, and Xanax. (R. at 39–43). With the exception of Prozac, which Plaintiff admitted that she often forgot to take, each of these medications was described by Plaintiff as causing drowsiness throughout the day and making it difficult for her to wake up in the morning. (*Id.*). She stated that she typically slept three to four hours between the hours of 8:00 a.m. to 5:00 p.m. (R. at 39–40). Plaintiff testified that prior to being prescribed Trazodone she was unable to sleep due to restless thoughts and leg pain, but the drug made it difficult for her to wake in the morning. (R. at 40–41). She asserted that she would not be able to get up in the morning to attend work due to drowsiness but maintained that she needed these medications to feel better. (R. at 41).

Plaintiff's counsel next inquired into Plaintiff's low back pain, which she testified affected her ability to sit for extended periods of time. (R. at 43–44). Plaintiff also suffered from bilateral foot pain, which allegedly affected her abilities to walk, stand, or focus on tasks. (R. at 44). Counsel then inquired whether she would be able to stay focused on a job which consisted of working in front of a computer with a sit/stand option, to which Plaintiff responded in the negative. (*Id.*). She elaborated that she could not pay attention for more than a couple of minutes and felt guilty that she could not help her daughter when asked. (R. at 45). Finally, she testified to daily problems with anxiety and panic when around other people. (R. at 45–46).

The vocational expert, Mr. Edelman, then testified regarding Plaintiff's work history. (R. at 47). Plaintiff had past work as a waitress (light, unskilled) and as an office assistant (not

---

[21] Klonopin (generic name "Clonazepam"), "is used alone or together with other medications to treat certain seizure (convulsive) disorders. …It is also used to treat panic disorder in some patients." Mayoclinic.com, Clonazepam, *available at http://www.mayoclinic.org/drugs-supplements/clonazepam-oral-route/description/drg-20072102* (last visited January 16, 2014).

classified by the vocational expert). (*Id.*). The ALJ posited a hypothetical individual with the same age, education, and work history as Plaintiff. (*Id.*). This individual was also limited to the following: sedentary work in a stable and low stress environment; not able to operate foot pedal controls; given the option to change positions from sitting to standing every ten to twenty minutes; simple, routine, and repetitive tasks; and no more than minimal contact with the public. (R. at 48). The hearing transcript states that the title of the position was "[INAUDIBLE]" during the hearing, but 560,000 positions existed nationally. *Id.* Suitable positions also existed as a sorter/grader, with 37,000 jobs in the national economy, and as a packer, with 50,000 jobs existing. (*Id.*).

The ALJ further developed this hypothetical by asking the vocational expert to assume that the individual possessed the level of vocational functioning possessed by a person with a valid GAF score between 58 and 63. (R. at 48). The vocational expert concluded that such an individual would be able to perform the same jobs he previously identified. (*Id.*). The ALJ asked if there were any conflicts between the dictionary of occupational titles ("the DOT") and the classifications that the vocational expert used. (*Id.*). The vocational expert answered that the DOT did not speak to the sit/stand option. (*Id.*). Further, although the DOT listed the jobs of packer and sorter/grader as light, his own data indicated a number of such jobs existing in the sedentary category. (*Id.*).

Plaintiff's counsel then inquired of the vocational expert whether there would be any jobs available for an individual with Plaintiff's education and background, who was unable to get out of bed in the morning, and/or required a three to four hour nap during each work-day. (R. at 49). The vocational expert answered that there would not be any jobs for such a person. (*Id.*). Counsel next asked whether the jobs previously identified by the vocational expert would be available to

a person who was off task at least twenty percent of the work-day due to racing thoughts, pain, and discomfort; the vocational expert responded in the negative. (R. at 49–50). The vocational expert further testified that there would be no jobs available to a person who was absent from work two to three days per month due to mental illness and the side effects from medication. (R. at 50). Finally, in response to counsel's question about whether a person with a GAF of 52 could perform the aforementioned jobs, the vocational expert explained that it was difficult to determine, describing it as a "gray area." (*Id.*).

## IV.  STANDARD OF REVIEW

To be eligible for Social Security benefits under the Act, a claimant must demonstrate to the Commissioner that he or she cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least twelve months. 42 U.S.C. § 423(d)(1)(A); *Ramirez v. Barnhart*, 372 F.3d 546, 550 (3d Cir. 2004). When reviewing a claim, the Commissioner must utilize a five-step sequential analysis to evaluate whether a claimant has met the requirements for disability. 20 C.F.R. §§ 404.1520, 416.920.

The Commissioner must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, App'x 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see Rutherford v. Barnhart*, 399 F.3d 546, 551 (3d Cir. 2005).

If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given claimant's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 205 (3d Cir. 2008).

Judicial review of the Commissioner's final decisions on disability claims is provided by statute, and is plenary as to all legal issues. 42 U.S.C. §§ 405(g)[22], 1383(c)(3)[23]; *Hagans v. Comm'r of Soc. Sec.*, 694 F.3d 287, 292 (3d Cir. 2012). Section 405(g) permits a district court to review the transcripts and records upon which a determination of the Commissioner is based; the court will review the record as a whole. *See* 5 U.S.C. § 706. The district court must then determine whether substantial evidence existed in the record to support the Commissioner's findings of fact. *Hagans,* 694 F.3d at 292.

Substantial evidence is "more than a mere scintilla but may be less than a preponderance." *Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 545 (3d Cir. 2003). It means "such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion.

---

[22] Section 405(g) provides in pertinent part:

> Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action ... brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business.

42 U.S.C. § 405(g).

[23] Section 1383(c)(3) provides in pertinent part:

> The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

42 U.S.C. § 1383(c)(3).

*Id.* (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1983)). If the Commissioner's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Davis v. Astrue*, 830 F. Supp.2d 31, 34 (W.D. Pa. 2011). When considering a case, a district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh the evidence of record; the court can only judge the propriety of the decision in reference to the grounds invoked by the Commissioner when the decision was rendered. *Mussi v. Astrue*, 744 F. Supp. 2d 390, 404–05 (W.D. Pa. 2010) (quoting *Palmer v. Apfel*, 995 F. Supp. 549, 552 (E.D. Pa. 1998)); *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196–97 (1947). The court will not affirm a determination by substituting what it considers to be a proper basis. *Chenery*, 332 U.S. at 196–97. Further, "even where this court acting *de novo* might have reached a different conclusion . . . so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings." *Albert Einstein Med. Ctr. v. Sebelius*, 566 F.3d 368, 373 (3d Cir. 2009) (quoting *Monsour Med. Ctr. v. Heckler*, 806 F. 2d 1185, 1190–91 (3d. Cir. 1986)).

## V.     DISCUSSION

### A.     ALJ's decision

The ALJ found that Plaintiff had not engaged in substantial gainful activity since her application date of March 9, 2010. (R. at 13). Plaintiff was found to have the following severe impairments: alcoholic neuropathy, anxiety disorder, depressive disorder, and alcohol dependence. (*Id.*). None of these impairments on its own, or a combination thereof, met or medically equaled the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, App'x 1. (R. at 13); 20 C.F.R. §§ 416.920(d), 416.925, and 416.926. In reaching this finding, the

ALJ considered Plaintiff's complaints of musculoskeletal pain in accord with the revised listings published in the Federal Register, but none of the medical findings met or equaled the criteria for severity therein. (R. at 13).

The ALJ considered the "paragraph B" criteria in evaluating the severity of Plaintiff's mental impairments, singularly and in combination, and concluded that Plaintiff had the following: "mild limitation in activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration; persistence or pace; and…no episodes of decompensation." (R. at 13–14). These impairments did not cause Plaintiff to suffer from at least two "marked" limitations or a single "marked" limitation accompanied by "repeated" episodes of decompensation. (R. at 14). Accordingly, the "paragraph B" criteria were not satisfied. (*Id.*).

The ALJ found insufficient evidence to establish the existence of "paragraph C" criteria. (*Id.*). Plaintiff's mental impairments did not render her completely unable to function outside her home, were attenuated by medication and psychosocial support, and did not cause repeated episodes of decompensation. (*Id.*). Further, Plaintiff did not demonstrate a history of one or more years of inability to function outside a supportive living arrangement or that minimal increases in mental demands or changes to the environment would cause episodes of decompensation. (*Id.*). Accordingly, Plaintiff's mental impairments did not meet the "paragraph C" criteria. (*Id.*).

Plaintiff was found to have the following Residual Functional Capacity ("RFC"):

[the ability to] perform sedentary work as defined in 20 C.F.R. § 416.967(a), except she can perform no work involving the use of foot or pedal controls, and she needs to change positions at least every 10 to 20 minutes. Additionally, the claimant needs to work in a low stress environment, defined as one involving only simple, routine and repetitive tasks, with minimal interaction with the public.

(*Id.*). A thorough analysis of Plaintiff's alleged symptoms and the evidence of record followed. (*Id.*). The ALJ found that Plaintiff had not undergone regular treatment for depression since the alleged onset date in 1997 and only resumed treatment shortly before filing her disability claim. (R. at 15). Further, the ALJ noted Plaintiff's testimony that she did not always take her prescribed Prozac. (*Id.*). Plaintiff was found not credible to the extent that her statements regarding the intensity, persistence, and limiting effects of her symptoms were inconsistent with the ALJ's RFC. (*Id.*). The ALJ granted little weight to the disability report as well as Ms. Watson's opinion, concluding that both lacked support and were inconsistent with the record. (R. at 17).

The ALJ found that Plaintiff was unable to perform any of her past relevant work. (R. at 18). She had completed a high school education and was able to communicate in English. (*Id.*). Because Plaintiff's past work was unskilled, transferability of job skills was not found to be an issue. (R. at 19). Considering Plaintiff's age, education, work experience, and residual functional capacity, the ALJ concluded that there were jobs which Plaintiff could perform existing in significant numbers in the national economy. (*Id.*). The ALJ cited the following positions which were identified by the vocational expert: assembler (60,000 positions); sorter/grader (37,000 positions); and packer (50,000 positions). (*Id.*). Although there was a discrepancy between the vocational expert's testimony and the DOT, the ALJ noted that the vocational expert had used his expertise to identify positions that were available in the sedentary range. (*Id.*). Finally, the ALJ concluded that Plaintiff had not been under a disability, as defined in the Act, since the date of her application, March 9, 2010. (R. at 20).

On appeal, Plaintiff offers several arguments in objection to the ALJ's decision. (Docket No. 10). Plaintiff argues that the ALJ: (1) erred in finding that Plaintiff's mental impairments did

not meet or exceed the listings for mental disorders; (2) erred in determining Plaintiff's RFC; (3) and erred by positing a flawed hypothetical to the vocational expert. (*Id.* at 11–14). Additionally, Plaintiff argues that an order granting benefits is proper. (*Id.* at 14). Defendant counters that the ALJ's decision was supported by substantial evidence and neither a remand nor an order granting benefits is warranted. (Docket No. 14 at 15).

**B.     The ALJ's Finding that Plaintiff's Mental Impairments Did Not Meet or Exceed the Listings for Mental Disorders**

Plaintiff's preliminary argument is that the ALJ erred in finding that her mental impairments did not meet or exceed the listings for mental disorders. (Docket No. 10 at 7). Specifically, Plaintiff argues that the ALJ's error stemmed from his decision to grant little weight to the opinions of Dr. Mandoly and Kristine Watson. (*Id.*). Defendant responds that the ALJ's decision was supported by substantial evidence. (Docket No. 14 at 9).

Plaintiff argues that in granting little weight to Dr. Mandoly's disability opinion ("the disability opinion"), the ALJ "cherry-picked" the record and supplanted Dr. Mandoly's medical opinion with his own. (Docket No. 10 at 10). Plaintiff is correct in stating that the opinions of treating physicians are generally entitled to substantial and possibly controlling weight. *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 201–02 (3d Cir. 2008); *Fargnoli v. Massanari*, 247 F.3d 34, 43 (3d Cir. 2001); S.S.R. 96-5P, 1996 WL 374183, at *4. In order to be accorded greater weight, however, the treating physician's opinion must be "well-supported by medically acceptable clinical and laboratory diagnostic techniques and . . . not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 416.927(c)(2). The ALJ is entitled to weigh all of the evidence in the record and may assign a non-treating physician's opinion greater weight if that decision is supported by the record evidence. *Brown v. Astrue*, 649 F.3d 193, 196 (3d Cir. 2011). In weighing relevant medical evidence, the ALJ may choose which opinions to

accord greater weight, but may not reject or ignore evidence in the record without providing a rationale. *Id.* (citing *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000)). The opinion of a treating physician may be rejected outright only on the ground of contradictory medical evidence. *Id.*

The ALJ properly concluded that the limitations assessed in the disability opinion were inconsistent with Dr. Mandoly's own treatment notes. (R. at 17). Hence, the ALJ may grant less weight to Dr. Mandoly's medical opinion which as unsupported by or inconsistent with the physician's own medical notations. *Rimel v. Astrue*, 521 F. App'x 57, 59 (3d Cir. 2013). To that end, the Court finds it telling that none of the notations made by Dr. Mandoly suggest that Plaintiff suffered from the vast number of marked and extreme mental limitations assessed in the disability opinion. (R. at 17–18, 407–25, 439–43). Aside from having a dysthymic mood and occasionally appearing teary-eyed, Plaintiff's mental faculties were consistently observed as normal. (R. at 17–18, 407–25).

In addition to being inconsistent with Dr. Mandoly's notes, the limitations assessed in the disability opinion are inconsistent with the record as a whole. (R. at 17–18). The ALJ is entitled to weigh all of the record evidence in determining the weight to grant the opinion of a treating physician. *Brown*, 649 F.3d at 196. While being treated at the Staunton Clinic from February 9, 2010 to December 8, 2011, Plaintiff's GAF scores ranged from 52 to 64. (R. at 18, 412–39). An upward trend is visible in these scores, with Plaintiff receiving the following scores during her last four visits: 63[24] (August 23, 2010), 58[25] (September 16, 2010), 64 (October 4, 2010), and 63

---

[24] A GAF score of 61–70 indicates "[s]ome mild limitations (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR) 34 (4th ed. 2000).

[25] A GAF score of 51–60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning." *Id.*

(December 29, 2010). (R. at 412–15). Despite these GAF scores, which indicate mild to moderate limitations, the disability opinion assessed Plaintiff with a vast array of marked and extreme limitations, allegedly existing since February 9, 2010. (R. at 18, 443). Furthermore, the disability opinion, dated February 6, 2012, listed Plaintiff's highest GAF in the last year as 65. (R. at 18, 439). This is inconsistent with the assertion in the same document that Plaintiff has suffered from marked and extreme limitations since February 9, 2010. (*Id.*). Given these inconsistencies, the ALJ's decision to grant less than significant weight was supported by substantial evidence. *See Brown*, 649 F.3d at 196; *Morales*, 225 F.3d at 317.

The ALJ properly found that the disability opinion lacks supporting explanations and objective findings. (R. at 17, 439). Although Dr. Mandoly signed the disability opinion, he did not include any laboratory or clinical findings to support the conclusions therein. (R. at 17). Sections on the form labeled "clinical findings" and "other symptoms and remarks" were left blank. (R. at 440). In reviewing same, this Court notes that an ALJ may grant less weight to the opinion of a treating physician depending on the extent to which supporting explanations are included. *Bruni v. Astrue*, 773 F. Supp. 2d 460, 475 (D. Del. 2011) (citing *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999)). Form reports in which a physician's obligation is only to check a box or fill in a blank are at best weak evidence, particularly when unaccompanied by objective supporting evidence. *Terwilliger v. Comm'r of Soc. Sec.*, CA 13-924, 2014 WL 222007, at *16 (W.D. Pa. Jan. 21, 2014) (Fischer, J.) (quoting *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993)). The ALJ properly concluded that the disability opinion was not supported by objective findings. His decision to grant it less weight was supported by substantial evidence. (R. at 17–18).

In addition to the disability opinion signed by Dr. Mandoly, the record contains a form report by Kristine Watson, whose credentials are not clear. (R. at 17, 438). Ms. Watson diagnosed Plaintiff with depression, neuropathy, and anxiety and concluded that she was disabled from work. (*Id.*). Although the form states that Ms. Watson is a licensed medical provider, there is no indication that she is a medical doctor. (*Id.*). The list of acceptable medical sources entitled to establish impairments is limited to licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists. 20 C.F.R. § 416.913(a). The regulations provide that "other sources," such as nurse practitioners, physicians' assistants, and welfare agency personnel, may provide opinions on the severity of a claimant's impairment. 20 C.F.R. § 416.913(d). These opinions, "although not technically 'acceptable medical sources' under Social Security rules, are to be evaluated on key issues such as impairment severity and functional effects, although their opinions cannot establish the existence of a medically determinable impairment." *Smith v. Astrue*, Civ. A. No. 08-347, 2008 WL 4853757, at *7 n.16 (W.D. Pa. Nov. 6, 2008); 20 C.F.R. § 416.913(d). The weight of these opinions is to be determined using the same factors as those used in evaluating the opinions of acceptable medical sources, including: the length and frequency of treatment, its consistency with the record, supportability, and the degree of explanation for the opinion. *Id.*

The ALJ's decision to grant little weight to Ms. Watson's opinion was supported by substantial evidence. (R. at 17). Assuming Ms. Watson is considered an "other source" under the regulations, she was not qualified to establish the existence of the impairments diagnosed in her report. *See Smith*, 2008 WL 4853757, at *7 n.16. Moreover, even if Ms. Watson were an acceptable medical source for purposes of the Act, she still would not be qualified to opine on the ultimate issue of disability. The assessment of disability is reserved to the Commissioner and

a treating source's opinion that a claimant is disabled from work is not entitled to controlling or significant weight. S.S.R. 96-5P, 1996 WL 374183, at *5. Additionally, her opinion is conclusory and consists of no more than a single page of check mark boxes. (R. at 17, 438). *See Mason*, 994 F.2d at 1065 (describing form reports consisting of check boxes as weak evidence at best). Although check marks on the form indicate that the assessment of disability was based upon a physical examination, medical records, clinical history, and diagnostic procedures, none of these supportive findings were included therein. (R. at 438). *See Plummer*, 186 F.3d at 429. Accordingly, the ALJ did not err in granting little weight to Ms. Watson's opinion.

### C.      The ALJ's Determination of Plaintiff's Residual Functional Capacity

Plaintiff next argues that the ALJ erred in assessing Plaintiff's RFC because he failed to accord significant weight to the opinion of Dr. Mandoly. (Docket No. 10 at 11–12). Further, Plaintiff argues that the ALJ erred by failing to consider Plaintiff's sleep disturbances, hypertension, bipolar disorder, and side effects from her medication when formulating the RFC. (*Id.* at 12.). Defendant responds that the ALJ's decision was supported by substantial evidence. (Docket No. 14 at 11–12).

Plaintiff's arguments lack merit. RFC is defined as "the most you can still do despite your limitations. We will assess your residual functional capacity based on all the relevant evidence in your case record." 20 C.F.R. § 416.945(a)(1). When formulating a claimant's RFC, an ALJ must consider all of the relevant evidence but need only include those limitations that are credibly established. *Garret v. Comm'r of Soc. Sec.*, 274 F. App'x. 159, 163 (3d Cir. 2008). Credibility determinations are solely within the province of the ALJ. *Van Horn v. Schweiker*, 717 F.2d 871, 873 (3d Cir. 1983). The ALJ thoroughly reviewed the medical evidence and properly found that Plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms were not credible to the extent that they were inconsistent with his RFC assessment. (R. at 15–

18). For the reasons discussed above, the ALJ's decision to grant less weight to the opinions of Dr. Mandoly and Ms. Watson was supported by substantial evidence. Accordingly, the ALJ did not err by formulating an RFC that omitted the limitations assessed in those opinions.

Contrary to Plaintiff's argument, the ALJ did discuss Plaintiff's alleged medication side effects. (R. at 18). The ALJ found Plaintiff's testimony that her medication caused her to sleep for several hours a day inconsistent with the GAF scores indicated in notes from the Staunton Clinic. (*Id.*). Further, Plaintiff denied experiencing any side effects in her supplemental function questionnaire and disability appeal form. (R. at 176, 181). The ALJ may find a claimant less than fully credible if there are inconsistencies between the claimant's testimony and the evidence of record. *See Salles v. Comm'r of Soc. Sec.*, 229 F. App'x 140, 146 (3d Cir. 2007). Although Plaintiff is correct that the ALJ did not provide a discussion of her alleged sleep disturbances, hypertension, and bipolar disorder, this omission was not error. (Docket No. 10 at 11–12). None of the sources that examined Plaintiff or her medical records attributed any limitations to these alleged impairments. Moreover, the only diagnoses listed as a basis for the limitations in the disability opinion are depression, neuropathy, and anxiety. (R. at 439). An ALJ is not required to consider and discuss any alleged impairments upon which the claimant's medical sources did not rely as bases for limitations. *Wible v. Astrue*, Civ. A. No. 06-4349, 2007 WL 2253435, at *2 (E.D. Pa. Aug. 2, 2007). Accordingly, the ALJ did not err by declining to discuss these alleged impairments.

## D.     The ALJ's Hypothetical

Finally, Plaintiff argues that the hypothetical presented by the ALJ to the vocational expert failed to reflect all of Plaintiff's limitations and GAF scores. (Docket No. 10 at 13). Defendant counters that the hypothetical included all of Plaintiff's credibly established limitations and the ALJ was not required to base his disability decision on Plaintiff's GAF

scores. (Docket No. 14 at 14). The Court agrees with Defendant. When creating hypotheticals, an ALJ is not required to include limitations which are not credibly established or which are in conflict with the medical record. *Lynn v. Colvin*, Civ. A. No. 12-1200, 2013 WL 3854460, at *14 (W.D. Pa. July 24, 2013) (citing *Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005)). As discussed above, the ALJ properly found the limitations assessed in the disability opinion to be inconsistent with the evidence of record. (R. at 17–18). *See* 20 C.F.R. § 416.927(c)(2). Moreover, the disability opinion was conclusory, containing no objective medical evidence to support the limitations assessed therein. (R. at 17–18, 439–43). For the same reasons, the ALJ properly granted little weight to the opinion of Ms. Watson. (R. at 17–18). Accordingly, the ALJ's decision to posit a hypothetical that omitted limitations that were not credibly established was supported by substantial evidence.

Additionally, Plaintiff argues that the ALJ's hypothetical should have reflected the GAF score of 50 assessed in the disability opinion signed by Dr. Mandoly. (Docket No 10 at 13). The Court finds no merit to this argument. "Low GAF scores, standing alone, are never enough to satisfy the claimant's burden to show that he is disabled." *Wuerger v. Colvin*, Civ. A. No. 12-1428, 2013 WL 2254244, at *14 (W.D. Pa. May 22, 2013) (Fischer, J.). *See also* 65 Fed. Reg. 50746, 50764–65 (Aug. 21, 2000). Further, "the Social Security Administration has explicitly declined to endorse the use of the GAF scale because its scores do not have a direct correlation to the disability requirements and standards of the Act." *Coy v. Astrue*, Civ. A. No. 08-1372, 2009 WL 2043491, at *14 (W.D. Pa. July 8, 2009). As other courts in this circuit have recognized, "while GAF scores can indicate an individual's capacity to work, they also correspond to unrelated factors, and absent evidence that a GAF score was meant to indicate an impairment of ability to work, a GAF score does not establish disability." *Bracciodieta-Nelson v. Comm'r of*

*Soc. Sec.*, 782 F. Supp. 2d 152, 165 (W.D. Pa. 2011) (McVerry, J.). Plaintiff's records indicate that she was experiencing many social stressors unrelated to her ability to work, such as stress related to economics, her daughter's legal troubles, and her daughter's lifestyle choices. (R. at 427, 432, 435). For the reasons discussed above, the ALJ properly granted little weight to Dr. Mandoly's opinion and the GAF score assessed therein. The ALJ's decision to omit that GAF from his hypothetical was supported by substantial evidence.

### E.     A Grant of Benefits Is Not Warranted

Plaintiff concludes by arguing that an order granting benefits is proper in this case, rather than remand. (Docket No. 10 at 14). A judicial order granting benefits is warranted "only when substantial evidence on the record as a whole indicates that the claimant is disabled and entitled to benefits." *Schmidt v. Comm'r of Soc. Sec.*, 2013 WL 6188442, at *3 (D. N.J. Nov. 25, 2013) (citing *Podedworny v. Harris*, 745 F.2d 210, 221–22 (3d Cir. 1984)). For the reasons discussed above, the ALJ's decision to deny Plaintiff's application for SSI was supported by substantial evidence. Accordingly, an order by this Court directing an award of benefits is not warranted.

## VI.   CONCLUSION

Based upon the foregoing, the ultimate decision by the ALJ to deny benefits to Plaintiff was adequately supported by substantial evidence from Plaintiff's record. Reversal or remand of the ALJ's decision is not appropriate. Accordingly, Plaintiff's Motion for Summary Judgment [9] is denied, Defendant's Motion for Summary Judgment [13] is granted, and the decision of the ALJ is affirmed. Appropriate Orders follow.

*s/ Nora Barry Fischer*
Nora Barry Fischer
United States District Judge

Dated: January 27, 2014
cc/ecf: All counsel of record.